1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SUSAN MARTIN (AZ#014226)**
**JENNIFER KROLL (AZ#019859)**
**MARTIN & BONNETT, PLLC**
1850 N. Central Ave. Suite 2010
Phoenix, Arizona 85004
Telephone: (602) 240-6900
smartin@martinbonnett.com
jkroll@martinbonnett.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| JOHN ROBINSON, Individually and On Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| INVENTURE FOODS, INC., TERRY MCDANIEL, and STEVE WEINBERGER, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff John Robinson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation

conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Inventure Foods, Inc. ("Inventure" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.    This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Inventure securities between March 3, 2016 and March 16, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.    Inventure Foods, Inc. manufactures and markets healthy/natural and indulgent specialty snack food products in the United States and internationally. It operates in two segments, Frozen Products and Snack Products.

3.    Founded in 1986, the Company was formerly known as "The Inventure Group, Inc." and changed its name to Inventure Foods, Inc. in May 2010.    Inventure is

headquartered in Phoenix, Arizona and the Company's stock trades on NASDAQ, under the ticker symbol "SNAK."

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company lacked adequate internal controls over accounting and financial reporting; (ii) in turn, the Company's statements of operations in its fiscal year 2015 results press release contained incorrect figures; and (iii) as a result of the foregoing, Inventure's public statements were materially false and misleading at all relevant times.

5.     On March 9, 2017, the Company disclosed that it would not be able to timely file its annual report on Form 10-K for its fiscal year ended December 31, 2016 and that it expected to file a notification of late filing on Form 12b-25 with the SEC to obtain a 15-day extension of the filing deadline for the Form 10-K. The Company claimed it needed additional time to complete certain intangible asset and goodwill impairment tests, and that, as a result, the Company's independent registered public accounting firm had not completed its audit of the Company's financial statements and the assessment of the Company's internal control over financial reporting.

6.     On March 16, 2017, Inventure filed to delay its annual report for 2016 on Form NT 10-K with the SEC, stating that it anticipates that the statements of operations contained in the annual report "will differ materially" from those reported for its fourth quarter and fiscal year 2015. In the Form NT 10-K, the Company stated, in relevant part:

3

PART III — NARRATIVE

State below in reasonable detail why Forms 10-K, 20-F, 11-K, 10-Q, 10-D, N-SAR, N-CSR, or the transition report or portion thereof, could not be filed within the prescribed time period.

**As of March 16, 2017, the filing deadline for its Annual Report on Form 10-K for fiscal 2016 ("Annual Report"), Inventure Foods, Inc. (the "Company") had not yet completed its Fresh Frozen Foods trademark and goodwill impairment tests.  As a result, the Company's independent registered public accounting firm has not completed their audit of the Company's financial statements and the assessment of the Company's internal control over financial reporting.** The Company cannot eliminate the reasons causing the inability to file timely without unreasonable effort or expense. The Company intends to file the Annual Report as soon as practicable, and expects to do so on or before the fifteenth calendar day following the due date of the Annual Report.

**The Company anticipates that its statements of operations contained in the Annual Report will differ materially from those reported for its fourth quarter and fiscal year 2015 in its press release dated and filed with the Securities and Exchange Commission on March 3, 2016.**

The Company's expectation regarding the timing of the filing of the Annual Report and material changes from the press release dated March 3, 2016 are forward-looking statements as defined in the Private Securities Litigation Reform Act of 1995, and actual events may differ from those contemplated by these statements. These statements are subject to certain risks and uncertainties, including the Company's, or its independent auditors, inability to complete the work required to file Annual Report in the time frame that is anticipated or due to unanticipated changes being required in its reported operating results.

(Emphasis added.)

4

7.     On this news, Inventure's share price fell $0.13, or 2.58%, to close at $4.91 on March 16, 2017. The stock price continued to decline in the following trading days, falling $0.48 per share (9.7%) on March 20, 2017, and $0.41 per share (9.2%) on March 21, 2017, to close at $4.02 per share on March 21, 2017.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

11.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).   Inventure's principal executive offices are located within this Judicial District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff, as set forth in the attached Certification, acquired Inventure securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant Inventure is incorporated in Delaware.  The Company's principal executive offices are located at 5415 East High Street, Suite 350, Phoenix, Arizona 85054. Inventure's shares trade on the NASDAQ under the ticker symbol "SNAK."

15.     Defendant Terry McDaniel ("McDaniel") has served at all relevant times as the Company's Chief Executive Officer ("CEO"), President and Director.

16.     Defendant Steve Weinberger ("Weinberger") has served at all relevant times as the Company's Chief Financial Officer ("CFO"), Treasurer and Secretary.

17.     The defendants referenced above in ¶¶ 15-16 are sometimes collectively referred to herein as the "Individual Defendants."

18.     Each of the Individual Defendants:

    a.     directly participated in the management of the Company;

    b.     was directly involved in the day-to-day operations of the Company at the highest levels;

    c.     was privy to confidential proprietary information concerning the Company and its business and operations;

d.    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.    approved or ratified these statements in violation of the federal securities laws.

19.    Inventure is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

20.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Inventure under *respondeat superior* and agency principles.

21.    Defendant Inventure and Individual Defendants are collectively referred to herein as "Defendants."

7

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Inventure Foods, Inc. manufactures and markets healthy/natural and indulgent specialty snack food products in the United States and internationally. It operates in two segments, Frozen Products and Snack Products.

### Materially False and Misleading Statements Issued During the Class Period

23.     The Class Period begins on March 3, 2016, when Inventure issued a press release, attached as Exhibit 99.1 on Form 8-K filed with the SEC, entitled "Inventure Foods Reports Fourth Quarter and Fiscal 2015 Financial Results."   The press release stated in relevant part:

> "We continued to experience operational challenges in the quarter, however, we were still able to end the year with a solid increase in the Snack segment with net revenues up approximately 9%, driven by strong Boulder Canyon and premium private label growth," said Terry McDaniel, Chief Executive Officer of Inventure Foods. "We continue to believe the headwinds we've experienced in our business are transitory and we expect to see improvement in our consolidated business as we progress through 2016. Going forward, our team remains focused on regaining momentum in Fresh Frozen and better meeting customer demand through increased Boulder Canyon capacity. We believe we have the right long-term strategy in place to achieve increased distribution and volume growth across our frozen and snack brand portfolios."
>
> **Fourth Quarter Fiscal 2015**
>
> Consolidated net revenues decreased 6.9% to $68.7 million, compared to $73.7 million in the prior year. Snack segment net revenues were consistent with the prior year and frozen segment net revenues decreased 11.3% primarily due to the Jefferson,

8

Georgia voluntary product recall. Excluding the Fresh Frozen business, consolidated net revenues decreased 2.0% and the frozen segment net revenues decreased 4.2% largely attributable to a decrease in frozen beverage sales.

Gross profit decreased $7.9 million to $7.3 million, or 10.7% as a percentage of net revenues, compared to $15.2 million, or 20.6% as a percentage of net revenues, in the fourth quarter of 2014. This was attributable to a gross profit decline of $6.3 million and $1.6 million in the Company's frozen and snack segments, respectively.

Selling, general and administrative ("SG&A") expenses were $9.0 million for the fourth quarter of 2015, compared to $9.2 million in the prior year, a decrease of 2.6% and as a percentage of net revenues, increased 50 basis points to 13.0%.

Interest expense was $2.9 million for the fourth quarter of 2015 compared to $0.7 million in the prior year as a result of increased borrowings, along with $0.6 million associated with borrowing under the bridge loan directly attributed to the Company's voluntary product recall and debt extinguishment costs of $0.6 million.

Net loss was $(2.5) million, or $(0.13) loss per share, for the fourth quarter of 2015, compared to net income of $3.4 million, or $0.17 diluted earnings per share, for the prior year. Excluding the costs associated with the product recall*, the bridge loan and debt extinguishment costs, adjusted net loss* was $(1.6) million, or $(0.08) loss per share, for the fourth quarter of 2015, compared to adjusted net income* of $3.4 million, or $0.17 diluted earnings per share, for the fourth quarter of 2014.

Net loss and adjusted net loss* have not been adjusted for the negative impact to earnings associated with Fresh Frozen recall sales interruptions of approximately $1.2 million, pre-tax, and the higher kettle chip production costs of $1.2 million, pre-tax, as a result of using outsourced production capabilities in order to meet demand. Furthermore, as a result of the Company's need for additional borrowings, excluding the bridge loan and debt

extinguishment costs, interest expense increased $1.0 million, pre-tax.

Excluding the cost of revenues associated with the voluntary product recall of $0.4 million pre-tax, adjusted EBITDA* was $0.6 million, for the fourth quarter of 2015, compared to $8.0 million in the prior year period.

**Fiscal 2015**

Consolidated net revenues decreased 1.1% to $282.6 million for the year ended December 26, 2015, compared to $285.7 million in the prior year. An increase of 8.7% in snack segment net revenues was partially offset by a 6.9% decrease in frozen segment net revenues. Excluding the Fresh Frozen business since the product recall, consolidated net revenues increased 5.9% and the frozen segment net revenues increased 3.6%.

Interest expense was $6.3 million for the year ended December 26, 2015 compared to $2.6 million in the prior year as a result of increased borrowings, along with $1.5 million associated with borrowing under the bridge loan directly attributed to the Company's product recall and debt extinguishment costs of $0.6 million.

Net loss was $(20.8) million, or $(1.06) loss per share, for the fiscal 2015, compared to net income of $10.6 million, or $0.53 diluted earnings per share, in the prior year. Excluding the costs of the product recall, related recall insurance recovery, the impairment of the intangible, the bridge loan and debt extinguishment costs, adjusted net loss* was $(1.4) million, or $(0.07) loss per share, for fiscal 2015, compared to adjusted net income* of $9.3 million, or $0.47 diluted earnings per share, in the prior year.

Net loss and adjusted net loss* have not been adjusted for the negative impact to earnings associated with Fresh Frozen recall sales interruptions of approximately $3.9 million, pre-tax, and the higher kettle chip production costs of $4.3 million, pre-tax, as a result of using outsourced production capabilities in order to meet demand. Furthermore, as a result of the Company's need for

additional borrowings, excluding the bridge loan and debt extinguishment costs, interest expense increased $1.6 million, pre-tax.

Adjusted EBITDA* was $9.6 million for the fiscal 2015, compared to $24.9 million in the prior year and includes the following adjustments:

2015

- Add back $21.3 million, pre-tax, of cost of revenues for recall-related disposal costs of inventory at the Company's facilities and product returns and fees from consumers and customers, as well as increased co-packing costs related to the Fresh Frozen business

- Add back $2.2 million, pre-tax, of SG&A expenses related to incremental professional fees related to the product recall

- Subtract $4.2 million, pre-tax, from cost of revenues for recall related insurance recoveries

- Add back $9.3 million, pre-tax, of intangible impairment expense

2014

- Subtract $2.7 million, pre-tax, from SG&A expenses for contingent consideration adjustment related to the Fresh Frozen acquisition

- Add back $0.4 million, pre-tax, of SG&A expenses related to the Jamba litigation settlement

- Add back $0.3 million, pre-tax, of SG&A expenses related to the secondary offering

**Segment Review**

The Company has two reportable segments: frozen and snack. The frozen product segment includes frozen fruits, vegetables,

11

beverages and desserts, for sale primarily to groceries, club stores and mass merchandisers. The snack segment includes manufactured potato chips, kettle chips, potato crisps, potato skins, pellet snacks, sheeted dough products, cereal and extruded product for sale primarily to snack food distributors and retailers.

***Frozen Segment:*** Net revenues for the fourth quarter of 2015 decreased 11.3% to $40.5 million, compared to $45.6 million in the prior year period, reflecting reduced sales of the Company's frozen vegetable products as a result of the voluntary product recall. Excluding the Fresh Frozen business, net revenues for the fourth quarter of 2015 decreased 4.2%. Gross profit for the fourth quarter of 2015 was $3.2 million. Excluding the costs associated with the Fresh Frozen product recall, gross profit was $3.6 million, compared to $9.5 million in the prior year period, and gross profit as a percentage of net revenues was 8.8%, compared to 20.9% in the prior year period.

Net revenues for the year ended December 26, 2015 were $167.2 million, a decrease of 6.9%, from $179.5 million in the prior year period. Excluding the Fresh Frozen business since the voluntary product recall, net revenues for fiscal 2015 increased 3.6%. Gross profit for the year ended December 26, 2015 was $2.7 million. Excluding the costs associated with the Fresh Frozen product recall, gross profit for fiscal 2015 was $19.9 million, compared to $32.3 million in the prior year and gross profit as a percentage of net revenues was 11.9%, compared to 18.0% in the prior year.

***Snack Segment:*** Net revenues during the fourth quarter were consistent with the prior year at $28.2 million, reflecting increased sales of premium private label products and T.G.I. Friday's, offset by decreased sales in co-pack products and Boulder Canyon, as a result of manufacturing capacity limitations that resulted in the proactive decision to reduce promotional activity. Gross profit was $4.1 million, compared to $5.6 million in the prior year. Gross profit as a percentage of net revenues was 14.4%, compared to 20.0% in the prior year, primarily as a result of $1.2 million of increased costs to produce certain kettle chips due to capacity constraints at the Company's Goodyear, Arizona facility.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Net revenues during the year ended December 26, 2015 were $115.4 million, an increase of 8.7% from $106.1 million in the prior year. Gross profit for the year ended December 26, 2015 was $17.6 million, compared to $20.8 million in the prior year. Gross profit as a percentage of revenue decreased to 15.3% compared to 19.6% in the prior year, primarily as a result of $4.3 million of increased costs to produce certain kettle chips due to capacity constraints at the Company's Goodyear, Arizona facility.

24.     On March 10, 2016, when Inventure filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 26, 2015 (the "2015 10-K"). For the quarter, Inventure reported a net loss of $2.46 million, or $0.13 per diluted share, on revenue of $68.66 million, compared to net income of $3.41 million, or $0.17 per diluted share, on revenue of $73.75 million for the same period in the prior year.  For 2015, Inventure reported a net loss of $20.78 million, or $1.06 per diluted share, on revenue of $282.56 million, compared to net income of $10.56 million, or $0.53 per diluted share, on revenue of $285.66 million for 2014.

25.     In the 2015 10-K, the Company stated, in relevant part:

**Evaluation of Disclosure Controls and Procedures**

The Company's management, including its Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the reporting period covered by this Form 10-K. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at December 26, 2015 for the purpose of providing reasonable assurance that the information required to be disclosed

13

in the reports we file or submit under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to the Company's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosures.

\*\*\*

The scope of management's assessment of the effectiveness of our internal control over financial reporting included all of our consolidated operations as of and for the year ended December 26, 2015.

Management assessed the effectiveness of internal control over financial reporting as of December 26, 2015, utilizing the criteria described in the "Internal Control - Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on our assessment and those criteria, management believes that we maintained effective internal control over financial reporting as of December 26, 2015.***

(Emphasis added.)

26.     The 2015 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Individual Defendants, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

27.     On May 3, 2016, when Inventure filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 26, 2016 (the "Q1 2016 10-Q").  For the quarter, Inventure reported a net loss of $1.02 million, or $0.05 per diluted share, on revenue of $69.86 million, compared to a net

loss of $14.64 million, or $0.75 per diluted share, on revenue of $77.61 million for the same period in the prior year.

28.    In the Q1 2016 10-Q, the Company disclosed in relevant part:

**Critical Accounting Policies and Estimates**

There have been no significant changes to our critical accounting policies and estimates since the filing of our Annual Report on Form 10-K for the year ended December 26, 2015.

\*\*\*

**Item 4.  Controls and Procedures.**

As of the end of the period covered by this Quarterly Report on Form 10-Q, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective for the purpose of providing reasonable assurance that the information required to be disclosed in the reports we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosures.

During the fiscal quarter ended March 26, 2016, there were no changes to the Company's internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

15

29.     The Q1 2016 10-Q contained signed certifications pursuant to the SOX by Individual Defendants, stating that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

30.     On July 28 2016, Inventure filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 25, 2016 (the "Q2 2016 10-Q").  For the quarter, Inventure reported a net loss of $280,000, or $0.01 per diluted share, on revenue of $69.26 million, compared to a net loss of $1.95 million, or $0.10 per diluted share, on revenue of $66.42 million for the same period in the prior year.

31.     In the Q2 2016 10-Q, the Company stated in relevant part:

**Critical Accounting Policies and Estimates**

There have been no significant changes to our critical accounting policies and estimates since the filing of our Annual Report on Form 10-K for the year ended December 26, 2015.

\*\*\*

**Item 4.  Controls and Procedures.**

As of the end of the period covered by this Quarterly Report on Form 10-Q, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective for the purpose of providing reasonable assurance that the information required to be

disclosed in the reports we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosures.

During the fiscal quarter ended June 25, 2016, there were no changes to the Company's internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

32.   The Q2 2016 10-Q contained signed certifications pursuant to the SOX by Individual Defendants, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

33.   On November 3, 2016, Inventure filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 24, 2016 (the "Q3 2016 10-Q").  For the quarter, Inventure reported a net loss of $2.56 million, or $0.13 per diluted share, on revenue of $66.53 million, compared to net income of $1.74 million, or $0.09 per diluted share, on revenue of $69.87 million for the same period in the prior year.

34.   In Q3 2016 10-Q, the Company stated in relevant part:

**Critical Accounting Policies and Estimates**

There have been no significant changes to our critical accounting policies and estimates since the filing of our Annual Report on Form 10-K for the year ended December 26, 2015.

17

***

## Item 4.  Controls and Procedures.

As of the end of the period covered by this Quarterly Report on Form 10-Q, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective for the purpose of providing reasonable assurance that the information required to be disclosed in the reports we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosures.

During the fiscal quarter ended September 24, 2016, there were no changes to the Company's internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

35.   The Q3 2016 10-Q contained signed certifications pursuant to the SOX by Individual Defendants, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

36.   The statements referenced in ¶¶ 23-35 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.

Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company lacked adequate internal controls over accounting and financial reporting; (ii) in turn, the Company's statements of operations in its fiscal year 2015 results press release contained incorrect figures; and (iii) as a result of the foregoing, Inventure's public statements were materially false and misleading at all relevant times.

## **The Truth Begins to Emerge**

37.    On March 9, 2017, the Company disclosed that it would not be able to timely file its annual report on Form 10-K for its fiscal year ended December 31, 2016 and that it expected to file a notification of late filing on Form 12b-25 with the SEC to obtain a 15-day extension of the filing deadline for the Form 10-K. The Company claimed it needed additional time to complete certain intangible asset and goodwill impairment tests, and that, as a result, the Company's independent registered public accounting firm had not completed its audit of the Company's financial statements and the assessment of the Company's internal control over financial reporting. In greater part, the Company stated:

> INVENTURE FOODS, INC. (Nasdaq: SNAK), a leading specialty food marketer and manufacturer, today announced that it will release its financial results for the fourth quarter and fiscal year ended December 31, 2016 on Thursday, March 30, 2017, before market open. The Company expects it will not be able to timely file its Annual Report on Form 10-K for its fiscal year ended December 31, 2016 (the "Form 10-K") and expects to file a notification of late filing on Form 12b-25 with the Securities and Exchange Commission to obtain a 15-day extension of the filing deadline for the Form 10-K.

> The Company requires additional time to complete certain intangible asset and goodwill impairment tests. As a result, the

Company's independent registered public accounting firm has not completed its audit of the Company's financial statements and the assessment of the Company's internal control over financial reporting.

38.   On March 16, 2017, Inventure filed to delay its annual report for 2016 on Form NT 10-K with the SEC, stating that it anticipates that the statements of operations contained in the annual report "will differ materially" from those reported for its fourth quarter and fiscal year 2015. In the Form NT 10-K, the Company stated, in relevant part:

PART III — NARRATIVE

State below in reasonable detail why Forms 10-K, 20-F, 11-K, 10-Q, 10-D, N-SAR, N-CSR, or the transition report or portion thereof, could not be filed within the prescribed time period.

*As of March 16, 2017, the filing deadline for its Annual Report on Form 10-K for fiscal 2016 ("Annual Report"), Inventure Foods, Inc. (the "Company") had not yet completed its Fresh Frozen Foods trademark and goodwill impairment tests. As a result, the Company's independent registered public accounting firm has not completed their audit of the Company's financial statements and the assessment of the Company's internal control over financial reporting.* The Company cannot eliminate the reasons causing the inability to file timely without unreasonable effort or expense. The Company intends to file the Annual Report as soon as practicable, and expects to do so on or before the fifteenth calendar day following the due date of the Annual Report.

*The Company anticipates that its statements of operations contained in the Annual Report will differ materially from those reported for its fourth quarter and fiscal year 2015 in its press release dated and filed with the Securities and Exchange Commission on March 3, 2016.*

The Company's expectation regarding the timing of the filing of the Annual Report and material changes from the press release

dated March 3, 2016 are forward-looking statements as defined in the Private Securities Litigation Reform Act of 1995, and actual events may differ from those contemplated by these statements. These statements are subject to certain risks and uncertainties, including the Company's, or its independent auditors, inability to complete the work required to file Annual Report in the time frame that is anticipated or due to unanticipated changes being required in its reported operating results.

(Emphasis added.)

39.     On this news, Inventure's share price fell $0.13, or 2.58%, to close at $4.91 on March 16, 2017. The stock price continued to decline in the following trading days, falling $0.48 per share (9.7%) on March 20, 2017, and $0.41 per share (9.2%) on March 21, 2017, to close at $4.02 per share on March 21, 2017

40.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

41.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Inventure securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

42.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Inventure securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Inventure or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

43.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

44.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

45.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Inventure;

- whether the Individual Defendants caused Inventure to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Inventure securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

47.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Inventure securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Inventure securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

48.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

49.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

50.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

52.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon

24

Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Inventure securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Inventure securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

53.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Inventure securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Inventure's finances and business prospects.

54.     By virtue of their positions at Inventure, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the

alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.   Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.   In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

55.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.   As the senior managers and/or directors of Inventure, the Individual Defendants had knowledge of the details of Inventure's internal affairs.

56.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Inventure.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Inventure's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Inventure securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Inventure's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired

Inventure securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

57.     During the Class Period, Inventure securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Inventure securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Inventure securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Inventure securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

58.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

59.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon

the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

60.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

61.   During the Class Period, the Individual Defendants participated in the operation and management of Inventure, and conducted and participated, directly and indirectly, in the conduct of Inventure's business affairs.  Because of their senior positions, they knew the adverse non-public information about Inventure's misstatement of income and expenses and false financial statements.

62.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Inventure's financial condition and results of operations, and to correct promptly any public statements issued by Inventure which had become materially false or misleading.

63.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Inventure disseminated in the marketplace during the Class Period concerning Inventure's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Inventure to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were

"controlling persons" of Inventure within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Inventure securities.

64.    Each of the Individual Defendants, therefore, acted as a controlling person of Inventure.  By reason of their senior management positions and/or being directors of Inventure, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Inventure to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Inventure and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

65.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Inventure.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 27, 2017

**MARTIN & BONNETT, PLLC**

By: s/ Jennifer Kroll
Susan Martin (AZ #014226)
Jennifer Kroll (AZ#019859)
1850 N. Central Ave. Suite 2010
Phoenix, Arizona 85004
Telephone: (602) 240-6900
Email: smartin@martinbonnett.com
jkroll@martinbonnett.com

_____

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice* app. to be filed)
J. Alexander Hood II (*pro hac vice* app. to be filed)
Hui M. Chang (*pro hac vice* app. to be filed)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
            ahood@pomlaw.com
            hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom (*pro hac vice* app. to be filed)

30

10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

31